IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| COREY LEE DOVE, | * | |
| Plaintiff | * | |
| v. | * | Civil Action No. DKC-18-1847 |
| PATUXENT FACILITY, | * | |
| WARDEN LAURA ARMSTEAD, | | |
| ASSISTANT WARDEN ALLEN GANG, | * | |
| PROPERTY OIC, | | |
| SGT. ANDERSON, | * | |
| Defendants | * | |

\*\*\*

**MEMORANDUM OPINION**

Defendants Patuxent Institution, Warden Laura Armstead, Assistant Warden Allen Gang, and former Correctional Officer Jason Anderson, filed a motion to dismiss the complaint or for summary judgment in response to Plaintiff's unverified civil rights complaint. ECF No. 10. The motion is supported by materials outside of the original pleadings, which have been considered by the court. The motion will therefore be construed as one for summary judgment. *See Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). Plaintiff Corey Lee Dove was advised of his right to file an opposition response to Defendants' motion and of the consequences of failing to do so. ECF No. 12. The motion remains unopposed. A hearing is deemed unnecessary for determination of the pending matters. *See* Local Rule 105.6 (D. Md. 2018). For the reasons stated below, Defendants' motion will be granted as to the claim addressed.

**Background**

Plaintiff Corey Lee Dove, a prisoner committed to the custody of the Maryland Division of Correction and, at all times relevant to the complaint, confined at Patuxent Institution, raises a First Amendment free exercise of religion claim. Mr. Dove observes Native American Religious

practices and states that when he arrived at Patuxent he discovered there was no group service in place for his chosen faith. ECF No. 1 at p. 2. Mr. Dove states that, after speaking with the chaplain, Kenneth Ingram, about starting such a service, it took over a month for Ingram to get worship services in place for Mr. Dove and other Native Americans to attend. *Id*. at p. 3.

Mr. Dove claims that during the wait for services to be instituted, he and other Native Americans attempted to observe their faith without the benefit of formal services. However, Mr. Dove and his fellow observers were subject to verbal harassment and disrespect from correctional officers at Patuxent. *Id*. Examples of the objectional behavior Mr. Dove claims he experienced included derisive comments regarding their attire, "disrespectful noises," and generally being singled out by officers when they became aware one of the inmates was Native American. *Id*. Additionally, Mr. Dove describes as disheartening the commentary made by officers who predicted there would never be Native American services instituted at Patuxent. *Id*.

In response to the derogatory comments directed at them, Mr. Dove and another Native American inmate, Jeremy Sykes, began filing administrative remedy procedure complaints, known as "ARPs," the month after they requested services to be provided for their worship. Shortly thereafter, a place was provided for services to be held, but Mr. Dove states that the "facility found every way it could to hinder our service." *Id*. Officers not named in the complaint would refuse to allow the attendees to go outside in a timely manner, leaving no time for "sending prayers out." *Id*. Although Mr. Dove also filed ARPs regarding these efforts, he claims nothing changed. *Id*.

Mr. Dove's housing tier was locked-down from February 11 to March 4, 2018, and he was not permitted to attend services during this time despite the fact that the reason for the lock-down "had nothing to do with [him]." *Id*. During this period Mr. Dove's mother passed away. *Id*. at p. 4. Mr. Dove explains that it is very important to his faith to have a sacred ceremony "for spirits

passing over." *Id*. Mr. Dove was denied the opportunity to have such a ceremony after his mother and one of his sisters passed away. *Id*.

Although donations to purchase supplies[1] for religious services were sent to Mr. Dove and the other participants in Native American worship, officials at Patuxent did not allow them to receive the donations. *Id*. Mr. Dove states that, when he and the other congregants filed ARPs regarding the donations, their complaints were denied on the basis that the donations were not sent in correctly. *Id*. According to Mr. Dove, however, all of the donations had been sent in the same way since the start of the program – donations and orders of supplies purchased by participants were sent to Chaplain Ingram. *Id*. Mr. Dove states that as long as Ingram knew about the incoming donations and supplies, the materials were allowed, but the policy suddenly changed without a change in the manner in which things were brought into the prison. *Id*.

In summary, Mr. Dove claims that obstacles were placed in the way of the free practice of his religion and that he and his fellow participants were treated unfairly. *Id*. at p. 5. He acknowledges that Native American religious services are disfavored due to the things needed for its practice but asserts that it is not a valid basis for the treatment they received. *Id*. He adds that he and Mr. Sykes were transferred out of Patuxent on the same day in a thinly-veiled attempt to end the Native American worship services. *Id*. As relief, Mr. Dove seeks monetary damages for the pain of losing the opportunity to participate in appropriate worship services following the passing of his mother and sister and an injunction requiring officials at Patuxent to provide appropriate services for Native Americans. *Id*. at p. 6.

---

[1] The supplies needed included sacred herbs, sweetgrass, sage and tobacco. ECF No. 4 at p. 4.

In a court-ordered supplement to the complaint, Mr. Dove explains that the individuals who were responsible for burdening his free practice of religion were Warden Laura Armstead, Assistant Warden Allen Gang, "Property OIC," and Sgt. Anderson. ECF No. 4 at p. 2. He adds a claim that his transfer to Jessup Correctional Institution (JCI) from Patuxent was done in retaliation for filing complaints concerning the conduct that interfered with Native American religious services. *Id*. Mr. Dove specifically alleges that Warden Armstead had a meeting regarding Native American services and "told everyone to stop everything about [the] service." *Id*. at p. 4. Shortly thereafter, Mr. Sykes and he were transferred to JCI. *Id*.

Mr. Dove also states that his sister passed away on March 30, 2018, and his mother passed away on February 4, 2018. ECF No. 4 at p. 3. He explains that the religious service following the death of a family member is to send prayers for the family members to "enter the spirit world in the correct gate." *Id*. Because he was not allowed properly to pray for his deceased family members, he states that he will now live with guilt that his mother and sister may "be stuck in a cold and lon[e]ly place." *Id*.

Defendants provide the following additional facts. On October 5, 2017, Mr. Dove was transferred to Patuxent. On an unspecified date, Mr. Dove's request for Native American Services was approved by the chaplain. ECF No. 10-2 at p. 2. With regard to the allegations raised in the complaint, Defendants rely on their responses to Mr. Dove's ARP complaints.[2] ECF No. 10-2 at pp. 16-68. Each ARP complaint and response is summarized below.

In ARP PATX0064-18, dated January 17, 2018, Mr. Dove complained that Native American services had not started on time once during the four months it had been held and that

---

[2] The declarations under oath provided by Warden Armstead, Assistant Warden Gang and Correctional Officer Jason Anderson simply conclude that each did not prohibit Mr. Dove from practicing his religion. *See* ECF Nos. 10-3, 10-4, and 10-5.

none of the services were "proper." ECF No. 10-2 at p. 17. He explained that the delay in starting the service was a problem because there is a lot of preparation required for each service and if they are rushed it made it difficult for them to stay grounded and focused during their prayers. *Id*. at p. 18. The investigation into the complaint consisted of the assigned officer, Cornae Shields, sending an email to Chaplain Ingram asking for the time slots for Native American services. *Id*. at pp. 19 and 21. Mr. Ingram confirmed that services were scheduled for Wednesdays at 7 p.m. to 9:30 p.m. and Saturdays from 9 a.m. to 10:30 a.m. *Id*. at p. 21. From this information Officer Shields concluded that: "[a]ccording to the time frames of the inmate service, any off tier movement is contingent on any mass movement or other daily movement throughout the institution that require (sic) custody staff." *Id*. at p. 20. Shields recommended dismissal of Mr. Dove's ARP complaint because of her view that he was not being denied an opportunity to practice his religion. *Id*. On February 12, 2018, Warden Armstead adopted the recommended disposition and observed that "no unlawful acts are being committed by Patuxent." *Id*. at p. 16.

In ARP PATX0250-18, filed on April 26, 2018, Mr. Dove complained that Property Officer Anderson was abusing his authority when he would not allow Mr. Dove to have a package mailed to him that contained red felt. ECF No. 10-2 at pp. 28-29. According to Mr. Dove, Officer Anderson told him there was a problem with the package because inmates are not allowed to have anything that is red. *Id*. at p. 29. During their exchange, Mr. Dove attempted to explain to Anderson that the Division of Correction Directives allowed inmates to have "any color headgear." *Id*. The investigation into this complaint included an interview with Officer Anderson who explained that the red felt contained in the package was prohibited by Executive Directive Order OPS.220.0004 prohibiting inmates from possessing dark blue, black, red, or camouflage clothing or pieces of cloth. *Id*. at pp. 23-24, *see also* p. 26, Exec. Dir. OPS.220.0004.03 C.1.d. While the

5

religious service manual (OPS.140.0002) does allow religious headgear of any color, the Executive Directive supersedes the religious service manual. *Id*. at p. 24. Warden Armstead dismissed the ARP complaint on May 18, 2018, noting the Executive Directive and observing that Sgt. Anderson was simply performing his duties properly. *Id*. at p. 22.

On April 9, 2018, in ARP PATX0236-18, Mr. Dove complained about donated items for worship not being distributed. ECF No. 10-2 at pp. 49-50. Mr. Dove states that for over two months donated items were not released to the Native American group for worship services and asked that property room staff be instructed to forward all donated religious items to Chaplain Ingram for distribution. *Id*. at p. 50. The investigation into the complaint revealed that the donated items were ordered by an individual on Mr. Dove's visitor's list "or who are closely related to the inmate (based o[n] addresses and zip codes.") *Id*. at p. 53. The donations were sent to Chaplain Ingram but were not approved after the package was inspected and found to contain "contraband and/or [items that] posed a legitimate security concern." *Id*., *see also* pp. 56-63 (invoices for items sent). On that basis, the donations were held for further investigation. *Id*. at p. 53. Based on that information, Warden Armstead dismissed the ARP on August 7, 2018. *Id*. at p. 51.

On May 13, 2018, Mr. Dove filed ARP PATX0298-18 complaining that Native American religious services had been cancelled the day before. ECF No. 10-2 at pp. 37-38. He explained that services were cancelled because of a "code that was called at 9:28 a.m." but that he and others had early set-up passes for 8:30 a.m. *Id*. at p. 37. They were required to stay in a bull-pen waiting for an escort for 55 minutes and the code for a fight was called at a time when his group should have been outside worshipping already. *Id*. at pp. 37-38. The investigation into this complaint by Administrative Remedy Coordinator Cornae Shields included an email to Captain Daniel Little inquiring whether services had been cancelled on the day in question. *Id*. at p. 42. Captain Little

responded[3] that religious services were not cancelled that day, but that inmate movement was on hold "while we contained the situation on E3." *Id*. Warden Armstead dismissed the complaint on the basis that services were not cancelled. *Id*. at p. 39. There is no indication that Mr. Dove and other Native American inmates were permitted the full 90 minute period for worship following the delay. An appeal to the Commissioner of Correction of Armstead's dismissal resulted in an affirmation of her decision. *Id*. at p. 36.

Although Defendants address the supplemental complaint, they do not address Mr. Dove's claim that his transfer to JCI was retaliatory.

**Standard of Review**

Summary Judgment

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing

---

[3] Captain Little's response is largely indecipherable as it mentions matters regarding the logistics of holding religious services that appear to have nothing to do with the delay or whether religious services were cancelled. ECF No. 10-2 at p. 42. In addition, he offers the following gratuitous observation, "Oh well. We running a jail not a daycare." *Id*.

that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

Free Practice of Religion

"Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *O'lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987). With respect to the free exercise of religion, prison inmates retain a right to reasonable opportunities for free exercise of religious beliefs without concern for the possibility of punishment. *See Cruz v. Beto*, 405 U.S. 319, 322 (1972) (per curiam). That retained right is not unfettered. As a threshold matter, to state a claim for violation of rights under the Free Exercise Clause, Mr. Dove must demonstrate that: (1) he holds a sincere religious belief; and (2) a prison practice or policy places a substantial burden on his ability to practice his religion. *See Wilcox v. Brosn*, 877 F. 3d 161, 168 (4th Cir. 2017) (citing *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981)). A substantial burden is placed upon a prisoner's religious exercise when it "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas*, 450 U.S. at 718. Nevertheless, prison restrictions that impact on the free exercise of religion but are related to

8

legitimate penological objectives do not run afoul of the constitution. *See Turner v. Safely*, 482 U.S. 78, 89-91 (1987).

Mr. Dove's religious practices are provided even greater protection under RLUIPA.[4] In relevant part, RLUIPA states:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ..., even if the burden results from a rule of general applicability, unless the government demonstrates that the imposition of the burden on that person—
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).

RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." *Cutter v. Wilkinson,* 544 U.S. 709, 721 (2005); *see Holt v. Hobbs,*___ U.S. ___, ___, 135 S.Ct. 853, 859–60 (2015); *Smith v. Ozmint,* 578 F.3d 246, 250 (4th Cir. 2009); *Lovelace v. Lee,* 472 F.3d 174, 186 (4th Cir. 2006). Enactment of RLUIPA restored religious free exercise rights to prisoners, similar to those enjoyed by those who are not incarcerated. *See Cutter*, 544 U.S. at 715-17.

---

[4] Although Defendants fail to address the viability of Mr. Dove's RLUIPA claim in light of his transfer from Patuxent, it is clear that RLUIPA does not support a claim for monetary damages against state officials like Defendants. *Sossaman v. Texas*, 563 U.S. 277, 293 (2011) (holding that acceptance of federal funds by States does not amount to consent to waiver of sovereign immunity to RLUIPA claims for monetary damages against state employees in their official capacities); *Rendelman v. Rouse*, 569 F.3d 182, 189 (4th Cir. 2009) (holding RLUIPA does not authorize a claim for money damages against a state employee sued in their individual capacity). As such, Plaintiff's only potential remedies under RLUIPA are equitable. Given the fact that Mr. Dove is no longer housed at Patuxent and his complaints relate to practices at Patuxent, a request for injunctive relief would be moot. Under these circumstances, Mr. Dove cannot maintain a claim based on RLUIPA, and Defendants' are entitled to summary judgment on this basis on the RLUIPA claim. *See Incumaa v. Ozmint*, 507 F.3d 281, 287 (4th Cir. 2007) (holding that transfer or release moots claim for injunctive relief under RLUIPA.)

RLUIPA defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A); *Holt,* 135 S.Ct. at 860; *Smith.* 578 F.3d at 251. Under RLUIPA, the inmate initially must show that the challenged policy substantially burdens his exercise of his religion. *See* 42 U.S.C. § 2000cc–2(b); *Holt*, 135 S.Ct. at 862. A prison regulation imposes a substantial burden when it places "substantial pressure on an adherent to modify his behavior and to violate his beliefs" or "forces a person to choose between following the precepts of [his] religion and forfeiting governmental benefits, on the one hand, and abandoning one of the precepts of [his] religion . . . on the other hand." *Lovelace*, 472 F.3d at 187. While Mr. Dove need not prove that the practice at issue is "required or essential to his [or her] religion" he must at least "demonstrate that the government's denial of a particular religious. . . observance was more than an inconvenience to [his] religious practice." *Tillman v. Allen*, 187 F.Supp.3d 664, 673 (E.D. Va. 2016) (citations omitted). "'[C]ourts properly consider whether the inmate retains other means for engaging in the particular religious activity . . . in assessing whether a denial of the inmate's preferred method for engaging in that religious exercise imposes a substantial burden.'" *Id*., 187 F.Supp.3d at 674 (quoting *Shabazz v. Va. Dep't Corr.*, 3:10CV638, 2013 WL 1098102, at *7 (E.D.Va. Mar. 15, 2013)).

RLUIPA "prescribes a shifting burden of proof for inmate religious exercise claims." *Incumaa v. Stirling*, 791 F.3d 517, 525 (4th Cir. 2015). A prisoner must initially "demonstrate that the prison's policy exacts a substantial burden on religious exercise," and then the burden "shifts to the government to prove its policy furthers a compelling governmental interest by the least restrictive means." *Id*. Prison security is a compelling interest. *Cutter*, 544 U.S. at 725, n. 13. Courts "are ill equipped to deal with the increasingly urgent problems of prison administration and reform" and must exercise restraint in cases dealing with the administration of prisons. *Procunier*

*v. Martinez*, 416 U.S. 396, 405 (1974). Deference is given to prison administrators who must regulate the prison while balancing the prisoners' rights to free exercise of religion with the maintenance of the security of the institution. *Cutter*, 544 U.S. at 723. Moreover, in enacting RLUIPA, Congress "anticipated that courts would apply [RLUIPA's] standard with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline consistent with considerations of costs and limited resources." *Cutter* 544 U.S. at 723 (citing legislative history).

Additionally, where a plaintiff is unable to sustain his RLUIPA claim, there is no need for the court to consider separately the claim under the First Amendment as the claim will necessarily fail there too as RLUIPA provides more protection for an inmate's religious exercise than the Free Exercise Clause. *See e.g. Tillman*, 187 F.Supp. 3d at 675; *Lovelace*, 472 F.3d at 198.

Retaliation

The retaliation claim raised is most fairly construed as a claim that he suffered retaliation for exercising his First Amendment right to petition for the redress of grievances. "The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). To state a claim of retaliation for exercising First Amendment rights, a plaintiff must show that: (1) the plaintiff engaged in protected First Amendment activity; (2) the defendant took some action that affected adversely the First Amendment rights; and (3) there was a causal relationship between the protected activity and the defendant's conduct. *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005).

While "the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large," "incarceration does not divest prisoners of all constitutional protections." *Shaw v. Murphy*, 532 U.S. 223, 228–29 (2001). "[A] prison inmate retains those First Amendment rights that are not inconsistent with the status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Specifically, the Fourth Circuit has held that an inmate's "right to file a prison grievance free from retaliation" is protected by the First Amendment. *Booker v. S. Carolina Dep't of Corrections*, 855 F.3d 533, 545 (4th Cir. 2017).

A plaintiff can establish this element of retaliatory conduct if the defendant took an action that would "deter a person of ordinary firmness from the exercise of First Amendment rights." *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017) (quoting *Constantine*, 411 F.3d at 500). Plaintiff must also demonstrate a causal connection between his First Amendment activity and the alleged retaliatory action. *See Constantine*, 411 F.3d at 501. The showing can be based on circumstantial evidence, such as evidence that the defendant was aware of the First Amendment activity and that the retaliation took place within some "temporal proximity" of that activity. *Id.*

**Analysis**

Defendants assert that the complaint does not adequately describe factual allegations that support a finding that each of them is responsible for an alleged deprivation of Mr. Dove's constitutional rights. Rather, the complaint includes generalized claims against Patuxent and does not describe how Warden Armstead, Assistant Warden Gang, and Officer Anderson participated in decisions or actions that operated to deprive Mr. Dove of his right to freely practice his religion. Defendants are correct that the complaint as supplemented does not contain any direct allegations against Assistant Warden Gang, entitling him to dismissal of any claims implied against him.

Simply put, Assistant Warden Gang is not liable for deprivation of constitutional rights, if any occurred, by virtue of his supervisory position. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983); *see also Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) (no respondeat superior liability in a Bivens suit). Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). In the absence of any specific allegations against Assistant Warden Gang, there is no basis to support a claim that he exhibited supervisory indifference or provided tacit authorization of the alleged wrongful conduct at issue in this case.

Further, any claims leveled at "Patuxent Institution" must be dismissed as it is not a "person" within the meaning of 42 U.S.C. § 1983. The text of the statute reads: "[e]very *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person with the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured . . ." 42 U.S.C. §1983 (emphasis supplied). Thus, viable 1983 claims may only be stated against a person, not the prison generally. The same cannot be said of Warden Armstead and Officer Anderson. Construing the complaint as supplemented liberally, as this court is obliged to do, Mr. Dove has alleged claims against these two Defendants beyond simply naming them as Defendants. Thus an analysis of the claims as to Armstead and Anderson is required.

Religion Claim

The gravamen of Mr. Dove's claim with respect to the free exercise of his religion is that his efforts to do so were deliberately burdened with late starts to services and the denial of needed religious items for worship services. Defendants have explained that delayed starts for worship services are a function of the fact that Patuxent Institution is a prison and often security staff is required for other duties and cannot be spared to escort inmates to services. Plaintiff must establish that Defendants' intentionally interfered with his religious practices. Negligent interference with religious exercise is not remediable under either the First Amendment or RLUIPA. *Lovelace*, 472 F.3d at 194; *Meyer v. Teslki*, 411 F. Supp. 2d 983, 991 (W.D. Wis. 2006) (holding a prison official violates an inmate's rights under RLUIPA if he **intentionally** and without sufficient justification denies an inmate his religiously mandated diet.) (emphasis added). While delays are unfortunate, there is no evidence outside of Mr. Dove's conclusory accusations that the delays were a deliberate attempt to interrupt Native American religious services.

A similar analysis applies to Mr. Dove's allegation that donated religious materials were improperly withheld from the Native American group. Again, there are legitimate security concerns cited by Defendants that override the inconvenience caused by the withholding of property meant for religious services. The pre-approval process for receiving such property was not arbitrarily changed or misapplied to the Native American group; rather, Mr. Dove simply failed to follow those requirements before having the items sent. Chief among the directives for prison officials to maintain the security of a prison is the controlled entry of outside property. Requiring strict adherence to the neutrally applicable rules and guidelines in place for the receipt of property, including items meant for religious use, is a legitimate security concern that overrides the burden

placed on Mr. Dove's ability to practice his religion in the manner he prefers. Thus, Defendants Armstead and Anderson are entitled to summary judgment in their favor on this claim.

## Retaliation Claim

Mr. Dove's claim that his transfer to JCI was retaliatory is a claim leveled solely at Warden Armstead. ECF No. 4. Because Defendants have not addressed the claim, review of the claim is limited to this court's screening authority under 28 U.S.C. §§ 1915A, 1915(e). A complaint may be dismissed pursuant to 28 U.S.C. § 1915A(b) if it is "frivolous, malicious or fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief." Under the provisions of 28 U.S.C. § 1915(e)(2) a case must be dismissed at any time if the court determines that (A) the allegation of poverty is untrue; or (B) the action or appeal (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief.

Here, Mr. Dove claims that his transfer to Jessup Correctional Institution (JCI) from Patuxent was in retaliation for filing complaints about conduct that interfered with Native American religious services and specifically alleges that Warden Armstead had a meeting regarding Native American services and "told everyone to stop everything about [the] service." ECF No. 4 at p. 4. Shortly thereafter, Mr. Dove and Mr. Sykes were transferred to JCI. The claim is not frivolous and does not fail to state a claim upon which relief may be granted. There is an allegation of protected activity: filing of ARP complaints, *see Booker*, 855 F.3d at 545, followed closely in time by an adverse action against Mr. Dove which he claims had a causal relationship to his protected activity, *see Constantine*, 411 F.3d at 499. Defendant Warden Armstead will therefore be required to respond to the claim of retaliation.

## CONCLUSION

By separate Order which follows, Defendants' motion to dismiss or for summary judgment, construed as one for summary judgment, will be granted as herein stated and Defendant Warden Armstead shall be required to answer or otherwise respond to the claim that Plaintiff was transferred from Patuxent Intuition to JCI in retaliation for filing ARP complaints.

June 5, 2019

/s/
DEBORAH K. CHASANOW
United States District Judge