# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| COREY LEE DOVE, | |
| Plaintiff, | |
| v. | **Civil Action No. 8:18-CV-01847** |
| WARDEN LAURA ARMSTEAD, in her official and individual capacity; JASON ANDERSON, in his individual capacity; JOHN DOE 1, in his individual capacity; JOHN DOE 2, in his individual capacity, | Hon. Deborah K. Chasanow |
| | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

## [PROPOSED] AMENDED COMPLAINT

## PRELIMINARY STATEMENT

1. This civil rights action is brought by Corey Lee Dove, a member of the Lakota Sioux who, along with dozens of other inmates, was denied the ability to meaningfully engage in Native American religious services by the staff at the Patuxent Institution ("Patuxent") and then transferred from Patuxent in retaliation for filing constitutionally protected administrative grievances intended to vindicate his right to religious exercise.

2. While Mr. Dove was in custody at Patuxent, he and other Native American worshipers faced discrimination and religious burdens, because members of the correctional staff were irritated with accommodating Native American religious services and sought to deter the Native American worshippers from holding them. To do so, the staff repeatedly harassed, strip-searched, denied access to religious items, and ridiculed Native American worshippers for their religious garb, and otherwise prevented from them meaningfully exercising their religious practices—mistreatment not visited upon similarly situated inmates of other faiths. When Mr. Dove complained in defense of his right to religious exercise, the staff intensified their harassment and discrimination in retaliation, which ultimately escalated to the point that Defendant Warden Laura Armstead transferred Mr. Dove and others to make it all go away.

3. The burdens that Defendants and other Patuxent correctional staff imposed on Mr. Dove's religious exercise not only denied him the ability to regularly practice his faith, but also left him with scars that strike at the very core of his Lakota spiritual identity. During Mr. Dove's incarceration at Patuxent, he lost both his mother and his sister; and the Defendants' hindrances on Mr. Dove's religious exercise denied him the ability to perform sacred rites for his mother's and sister's souls in accordance with Lakota traditions.

4. Those hindrances to Mr. Dove practicing his religion imposed an unjustified and substantial burden on his religious exercise and denied Mr. Dove equal protection under the law, all in violation of federal religious-protection law and the United States Constitution.

5. When Mr. Dove exercised his constitutionally protected right to seek redress for these grievances through administrative complaints, he and other Native American worshippers were further harassed and ultimately transferred in retaliation for filing their complaints.

6. By this Amended Complaint, Mr. Dove seeks relief based on the substantial burden Defendants imposed on his religious exercise, Defendants' denial of his right to equal protection, and the retaliation he faced for seeking to defend those rights.

## PARTIES

7. Plaintiff Corey Lee Dove is a prisoner committed to the custody of the Maryland Division of Correction. He is currently confined at Jessup Correctional Institution ("JCI") in Jessup, MD. He was previously confined at Patuxent Institution in Jessup, MD, until he was transferred to JCI on or about May 28, 2018.

8. On information and belief, Defendant Warden Laura Armstead is an individual who resides in the State of Maryland and is a citizen of the State of Maryland. At all times relevant to the events set forth and alleged in this Amended Complaint, Defendant Warden Armstead has held the position of Warden at Patuxent Institution.

9. On information and belief, Defendant Jason Anderson is an individual who resides in the State of Maryland and is a citizen of the State of Maryland. At all times relevant to the events set forth and alleged in this Amended Complaint, Defendant Jason Anderson was a correctional officer with the rank of Sergeant at Patuxent Institution who was in charge of the facility's property room.

10. On information and belief, Defendant John Doe 1 is an individual who resides in the State of Maryland and is a citizen of the State of Maryland. At all times relevant to the events set forth and alleged in this Amended Complaint, Defendant John Doe 1 was a correctional officer at Patuxent Institution who was, at times, responsible for escorting the Lakota faith group to and from its religious services and for supervising those services.

11. On information and belief, Defendant John Doe 2 is an individual who resides in the State of Maryland and is a citizen of the State of Maryland. At all times relevant to the events set forth and alleged in this Amended Complaint, Defendant John Doe 2 was a correctional officer at Patuxent Institution who was, at times, responsible for escorting the Lakota faith group to and from its religious services and for supervising those services.

## JURISDICTION AND VENUE

12. This Court has original federal question jurisdiction over Plaintiff's claims of violations of the United States Constitution and the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.*, pursuant to 28 U.S.C. § 1331.

13. This Court has federal question jurisdiction, pursuant to 28 U.S.C. § 1343 and 42 U.S.C. § 1983 over Plaintiff's claims regarding the deprivation under color of State law of rights secured by the laws of the United States and the First and Fourteenth Amendments to the United States Constitution.

14. On December 28, 2018, Defendant filed a Motion to Dismiss Or, in the Alternative, Motion for Summary Judgment, ECF No. 10, and did not challenge the Court's personal jurisdiction over Defendants Armstead and Anderson or the Court's subject matter jurisdiction over this action.

15. Plaintiff's claims for declaratory and injunctive relief are sought under 28 U.S.C. §§ 1343, 2201, and 2202, 42 U.S.C. § 1983, Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general, legal, and equitable powers of this Court.

16. Plaintiff's claims for attorneys' fees and costs are predicated upon 42 U.S.C. §§ 1988 and 2000cc-2(d), which authorize the award of attorneys' fees and costs to prevailing parties, pursuant to 42 U.S.C. § 1983 and RLUIPA.

17. Venue is proper in this district under 28 U.S.C. § 1391(b), in that the Defendants reside in in the District of Maryland and a substantial part of the events or omissions giving rise to the claim occurred in the District of Maryland.

## FACTUAL ALLEGATIONS

### A. Mr. Dove's Sacred Religious Practices and Beliefs

18. Mr. Dove is a member of Lakota Sioux, one of the several Native American tribes that make up the Sioux Nation in the western and midwestern United States.

19. Mr. Dove practices Lakota religious traditions, which make up a system of spirituality centering on Wakan Tanka, often translated as the Great Spirit or Great Mystery. Regular involvement in essential community ceremonies is fundamental to bringing Lakota followers psychological, physical, spiritual and emotional healing.

20. One of the rituals that is central to practicing Lakota religious traditions involves the Chanupa Wakan, the sacred pipe that serves as a bridge between this world and Wakan Tanka. The Chanupa is the principal means of conveying prayers to Wakan Tanka and other spirits that shepherd Lakota followers through life, death, and beyond. The Chanupa and the rituals surrounding it were revealed to the Lakota people thousands of years ago. As one authority on Lakota rites has recounted, that revelation communicated the Chanupa's

importance: "[A]ll the things of the universe[] are joined to you who smoke the pipe—all send their voices to *Wakan-Tanka*, the Great Spirit."[1]

21. Another of the Lakota sacred rites is the Keeping of the Soul, a ritual performed when a loved one dies. "It is through this rite that we purify the souls of our dead, and that our love for one another is increased."[2] The purpose of keeping a soul in accordance with the Lakota rite is "to purif[y] it that it and the Spirit become one, and it is thus able to return to the 'place' where it was born—*Wakan-Tanka*—and need not wander about the earth."[3]

22. With some variations, there is a specific setting for engaging in prayer by way of the Chanupa, for performing the Keeping of the Soul, and for carrying out the other traditional Lakota rites. It involves a pike carrier who knows the customary prayers; instruments and felt cloths of particular colors; sacred herbs, such as sweetgrass, sage, and tobacco; and a group of worshipers encircling a small fire. The Chanupa is properly blessed, filled with tobacco, and then passed clockwise around the circle so that each participant may communicate his or her prayers to Wakan Tanka. Without this ceremony and the sacred Chanupa, a follower's prayers cannot be properly communicated.

23. These traditions and rituals have been passed down by practice and by oral tradition through the many generations since being revealed to the Lakota people thousands of years ago. But they survive today despite repeated instances of government-sponsored religious persecution—just one aspect of the oppression that the Lakota, Sioux Nation, and many other

---

[1] Black Elk, *The Sacred Pipe: Black Elk's Account of the Seven Rites of the Ogalala Sioux* 6 (Joseph E. Brown ed. 1953).

[2] *Id.* at 10.

[3] *Id.* at 11.

Native American tribes have suffered at the hands of federal- and state-government officials.[4] Indeed, Lakota communities have preserved religious practices and traditions despite decades of prohibition on Lakota ceremonies and gatherings during the 1800s and 1900s, which threatened considerable loss of cultural continuity and knowledge.[5]

### B. The Substantial Burden Imposed on Mr. Dove's Religious Exercise

24. Mr. Dove was housed at Patuxent beginning in October 2017.

25. Patuxent Institution is a correctional facility that is owned, operated, or managed by, or provides services on behalf of the Maryland Division of Correction and the State of Maryland, and is an "institution" within the meaning of 42 U.S.C. § 2000cc-1(a) and 42 U.S.C. § 1997.

26. Upon discovering that there were no regularly conducted Native American religious services at Patuxent, Mr. Dove and a fellow inmate, Jeremy Sykes, asked Patuxent chaplain Kenneth Ingram and other Patuxent authorities to help them facilitate holding Native American religious services.

27. After Mr. Dove requested that Patuxent facilitate Native American religious services, he received negative and disrespectful feedback from multiple Patuxent correctional officers, including Defendants Anderson, Joe Doe 1, and John Doe 2. This negative and disrespectful feedback included Defendants Anderson, John Doe 1, John Doe 2 and other correctional officers ridiculing Mr. Dove for wearing traditional Native American clothing, mocking Native American culture with caricatured noises, and making statements that Mr. Dove and Mr. Sykes would never be able to hold Native American religious services at Patuxent.

---

[4] John Rhodes, *An American Tradition: The Religious Persecution of Native Americans*, 52 Mont. L. Rev. 1, 12–15 (1991).

[5] Raymond A. Bucko, *The Lakota Ritual of the Sweat Lodge: History and Contemporary Practice* 97–110 (1998).

28. Beginning in November 2017, Mr. Dove and Mr. Sykes began requesting that Native American religious services be provided for their worship, including by filing complaints under the administrative remedy procedure ("ARPs").

29. Approximately one month after Mr. Dove and Mr. Sykes began filing ARPs, they were provided a place to worship for themselves and other inmates who sought to practice Native American religious services, but thereafter Defendants Anderson, John Doe 1, John Doe 2 and other correctional officers repeatedly subjected them to hindrances that substantially burdened their ability to engage in Native American religious exercise.

30. Despite the hindrances and burdens that correctional officers placed on Native American religious exercise, Mr. Dove's faith group grew in popularity, reaching approximately 15 to 20 inmates who regularly engaged in Native American religious services. This faith group was made up of Mr. Dove, Mr. Sykes, and others, including inmates Nicholas Shumaker and Victor McCormick.

31. In accordance with Lakota religious traditions, the Native American religious services that Mr. Dove's faith group held entailed a number of different features, including preparing the appropriate religious items used in the rituals, gathering in a circle, blessing the Chanupa, and passing the Chanupa in a clockwise manner so that each participant could communicate their prayers. *See, e.g.*, *supra* ¶¶ 8–10. Because of these various features, when Mr. Dove's faith group was afforded time to hold its services, the group sought to avoid wasting time and to maximize the time that they were allotted, so that there was sufficient time to conduct the entire ceremony in an appropriate way. Because the Native American religious services took place outside, Patuxent was required to detail extra correctional officers in order to accommodate the services.

32. On information and belief, Patuxent correctional officers, including Defendants John Doe 1 and John Doe 2, were irritated with the inconvenience of accommodating Native American religious services and because they found the logistical work associated with accommodating Native American religious services to be bothersome.

33. On information and belief, the Doe Defendants' and other correctional officers' irritation with accommodating Native American religious services motivated them to discriminate against and burden the Native American faith group's religious exercise in order to deter worshippers from continuing to engage in Native American religious services, which would relieve the correctional officers of the inconvenience of accommodating those practices.

34. Defendants John Doe 1, John Doe 2, and other correctional officers repeatedly delayed the Native American faith group from going outside—a necessary condition for holding their religious exercise—for up to hours past when their outside time was scheduled and for such a long delay that the faith group had insufficient time to complete their ceremony, properly recite prayers, or otherwise satisfactorily engage in their religious exercises.

35. Defendants John Doe 1, John Doe 2, and other correctional officers also repeatedly and extensively strip-searched every single member of the faith group who was participating in the Native American religious services after they returned from their religious services.

36. At Patuxent, there were similarly situated inmates of other religious faiths who participated in other religious group worship who were not delayed to the point of precluding their religious exercise and who were not strip-searched every time they attempted to participate in religious services.

37. Mr. Dove filed at least one ARP complaining of the delays that correctional officers imposed and that precluded his faith group from engaging in their religious exercises.

38. For a period of three weeks in February and March, 2018, Patuxent refused to allow any services to be held based on a purported reason that no movement could be allowed due to an altercation on Mr. Dove's tier that was not related to him in any way. On information and belief, the reasons given for refusing to allow any Native American religious services to be held during this time were a pretext and instead reflected correctional officers' displeasure with being inconvenienced with having to accommodate the Native American services.

39. Defendants John Doe 1 and John Doe 2 and other correctional officers would not permit Mr. Dove to wear his ceremonial Native American headgear, which they ridiculed because it was the color purple and adorned with feathers. Defendants John Doe 1 and John Doe 2 and other correctional officers also criticized the feathered headbands belonging to other members of the faith group.

40. At Patuxent, there were similarly situated inmates of other religious faiths who were permitted to wear religious head garb, including religious head garb of different colors.

41. Defendant Anderson began refusing access to Lakota religious items—items necessary for the Lakota faith group's services—that Mr. Dove and others had ordered to be delivered to Patuxent or that outside Native American persons or religious organizations had sent to their faith group as donations. Defendant Anderson began refusing access to the religious items sent to Patuxent even though nothing had precluded similar deliveries and donations before the Native American religious services grew in popularity and before Mr. Dove had filed ARPs complaining of the hindrances they faced. Mr. Dove and others previously had no difficulties

accessing religious items delivered or donated to Patuxent, as long as the deliveries were addressed to Chaplain Ingram and he was alerted of their existence.

42. Mr. Dove filed more than one ARP complaining of being denied the religious items that were ordered and delivered to Patuxent or sent there as donations. Defendant Anderson responded that the items were not correctly sent, even though the items were sent using the same processes as items that were previously delivered without issue before the Native American religious services grew in popularity.

43. In response to Mr. Dove's complaints about Defendant Anderson denying him access to deliveries and donations of religious items, Defendant Anderson and other correctional officers derided the Lakota faith group as "crybabies" and accused them of "faking" their religious beliefs as an excuse to smoke tobacco.

44. On information and belief, there were similarly situated inmates of other religious faiths at Patuxent who were sent deliveries and donations containing religious items and who were permitted to access those religious items.

45. To this day, neither Mr. Dove nor any other follower of Lakota or any other Native American spiritual traditions has obtained the deliveries and donations of religious items that were sent to Patuxent in order to facilitate Patuxent's Native American religious services.

46. During the period of time when correctional officers were precluding Mr. Dove's faith group from meaningfully holding Native American religious services and substantially burdening their religious exercise, Mr. Dove's mother, Jeannie Dove, passed away on February 4, 2018, and Mr. Dove's sister, Monica Dove, passed away on March 30, 2018. Because the substantial burdens imposed by Patuxent correctional officers precluded Mr. Dove's faith group from meaningfully holding Native American religious services, Mr. Dove was unable to perform

the Keeping of the Soul ritual to purify either his mother's or his sister's soul in accordance with Lakota traditions. Mr. Dove still has not been able to perform the Keeping of the Soul ritual to purify either his mother's or his sister's soul.

47. The hindrances, delays, and burdens imposed on the Native American faith group's religious exercises by Defendants Anderson, John Doe 1, and John Doe 2 and by other correctional officers became increasingly onerous after Mr. Dove and others filed ARPs complaining of the difficulties they faced in holding their religious services.

48. On information and belief, Defendants Anderson, John Doe 1, John Doe 2, and other correctional officers delayed Native American services, gave pretexts for at times refusing to allow any services, disallowed and ridiculed Native American headgear, refused access to religious items, derided Mr. Dove as a "crybaby" who was "faking" his religion, and took other actions that substantially burdened and discriminated against Mr. Dove's religious exercise all because they were displeased at being inconvenienced with having to accommodate the Native American religious services, because they were irritated and displeased with the ARPs Mr. Dove and others filed, and because they sought to deter Mr. Dove's faith group from filing ARPs and from continuing to hold Native American religious services.

### C. Warden Armstead and Sergeant Anderson's Retaliation Against Mr. Dove and Other Native American Worshippers

49. Despite these hindrances, Mr. Dove's faith group continued its attempts to meaningfully hold Native American religious services and Mr. Dove persisted in attempting to vindicate his right to religious exercise through the ARP and appeals process.

50. On information and belief, Defendants Armstead, Anderson, Doe 1, and Doe 2 and other Patuxent correctional officers grew increasingly frustrated by and impatient with Mr.

Dove persisting in his attempts to hold Native American religious services and pursuing the right to do so through ARPs.

51. On information and belief, Warden Armstead held a meeting with a number of Patuxent staff members impacted by the Native American religious services, the faith group's continued efforts to hold them, and Mr. Dove's persistence in pursuing his rights through the ARP process. On information and belief, attendees of this meeting included Warden Armstead, Assistant Warden Allen Gang, Sergeant Anderson, and Chaplain Ingram.

52. On information and belief, Warden Armstead told the group at this meeting to refrain from taking any additional actions directed at the Native American faith group and that she would "handle it."

53. Within two weeks of Warden Armstead's meeting with correctional staff, both Mr. Dove and Mr. Sykes were transferred from Patuxent.

54. On information and belief, other members of the Native American faith group were also transferred from Patuxent. According to an publicly available database maintained by the Maryland Department of Corrections, at least two other inmates who participated in the Lakota faith group at Patuxent—specifically, Nicholas Shumaker and Victor McCormick—have also been transferred from Patuxent.

55. After Mr. Dove and others were transferred from Patuxent, there ceased to be any Native American religious services held at the institution. On information and belief, there are not Native American religious services held at Patuxent to this day. On information and belief, the Patuxent property room still has possession of the religious items sent to Mr. Dove and the Lakota faith group.

56. After Mr. Dove and Mr. Sykes were transferred from Patuxent, Warden Armstead and other correctional staff were relieved of their obligations to address pending worship-related ARPs.

57. As a result of Mr. Dove's and Mr. Sykes's transfers, members of the Patuxent correctional staff no longer have to expend time, resources, or manpower facilitating Native American religious services or addressing Mr. Dove's efforts to vindicate his rights to religious exercise through the ARP and appeal process.

**COUNT ONE**
**(Retaliation—First Amendment to the U.S. Constitution)**
**(Against Warden Armstead, Sergeant Anderson, John Doe 1, and John Doe 2 in Their Individual Capacities)**

58. Mr. Dove repeats, realleges, and incorporates by reference each and every allegation set forth above as if fully set forth herein.

59. Mr. Dove engaged in conduct protected by the First Amendment of the United States Constitution when he filed ARPs that requested Native American religious services be provided for their worship and when he filed ARPs that complained of burdens that Patuxent correctional officers placed on his religious exercise.

60. Correctional officers at Patuxent subjected Mr. Dove and his Native American faith group to substantial burdens on their religious exercise in retaliation for Mr. Dove filed ARPs that requested Native American religious services be provided for their worship and ARPs that complained of burdens that Patuxent correctional officers placed on his religious exercise.

61. The burdens correctional officers placed on Mr. Dove's religious exercise were not intended to advance any legitimate goals of the correctional institution, nor were those actions narrowly tailored to achieve any legitimate penological goal.

62. The burdens correctional officers placed on Mr. Dove's religious exercise would deter a person of ordinary firmness from filing ARPs requesting religious accommodations and from filing ARPs complaining of burdens placed on religious exercise.

63. Warden Armstead transferred Mr. Dove from Patuxent to JCI because he filed ARPs that requested Native American religious services be provided for their worship and ARPs that complained of burdens that Patuxent correctional officers placed on his religious exercise.

64. The act of transferring Mr. Dove from Patuxent to JCI was not intended to advance any legitimate goals of the correctional institution, nor was that action narrowly tailored to achieve any legitimate penological goal.

65. The act of transferring an inmate would deter a person of ordinary firmness from filing ARPs requesting religious accommodations and from filing ARPs complaining of burdens placed on religious exercise.

**COUNT TWO**
**(Equal Protection—Fourteenth Amendment to the U.S. Constitution)**
**(Against Warden Armstead, Sergeant Anderson, John Doe 1, and John Doe 2 in Their Individual Capacities)**

66. Mr. Dove repeats, realleges, and incorporates by reference each and every allegation set forth above as if fully set forth herein.

67. Defendants Anderson, John Doe 1, and John Doe 2, and other members of the correctional staff, subjected Mr. Dove and the Native American faith group to hindrances and burdens on their religious exercise that were not visited upon similarly situated inmates of other religious faiths.

68. The hindrances and burdens that Defendants Anderson, John Doe 1, and John Doe 2, and other members of the correctional staff, placed on Mr. Dove and the Native American faith group, which were not placed on similarly situated inmates of other religious faiths, were

the result of intentional or purposeful discrimination against Native American religious services based on displeasure at being inconvenienced with having to accommodate the Native American religious services.

69. The hindrances and burdens that Defendants Anderson, John Doe 1, and John Doe 2, and other members of the correctional staff, placed on Mr. Dove and the Native American faith group were not rationally related to any legitimate penological interest.

70. Defendant Warden Armstead decided to transfer Mr. Dove and other members of the Native American faith group, including Mr. Sykes, because of their desire to engage in Native American religious services, and there were similarly situated inmates of other religious faiths who were not transferred from Patuxent because of their desire to engage in those other faiths' religious services.

71. The decision to transfer Mr. Dove and other members of the Native American faith group, including Mr. Sykes, was the result of intentional or purposeful discrimination against Native American religious services based on Warden Armstead and other correctional officers' displeasure with being inconvenienced with having to address Mr. Dove's ARPs and to accommodate the Native American religious services that Mr. Dove's faith group sought to hold.

72. The decision to transfer Mr. Dove and other members of the Native American faith group, including Mr. Sykes, was not rationally related to any legitimate penological interest.

## COUNT THREE
### (Religious Exercise—Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §§ 2000cc-1)
### (Against Warden Armstead in Her Official Capacity)

73. Mr. Dove repeats, realleges, and incorporates by reference each and every allegation set forth above as if fully set forth herein.

16

74. By hindering Mr. Dove's faith group's effort to hold Native American religious services, Patuxent imposed a substantial burden on Mr. Dove's religious exercise.

75. By refusing to permit Mr. Dove and his faith group to use religious items necessary for Lakota religious practices, Patuxent imposed a substantial burden on Mr. Dove's religious exercise.

76. The substantial burdens placed upon Mr. Dove's religious exercise were not the least restrictive means of furthering a compelling governmental interest.

77. Mr. Dove was, at all times relevant to this matter, confined to Patuxent.

78. Patuxent is a prison and correctional facility that is owned, operated, or managed by, or provides services on behalf of a State, specifically the State of Maryland, and/or on behalf of political subdivision of a State, specifically the Maryland Department of Public Safety and Correctional Services, Division of Corrections, and is an "institution" within the meaning of 42 U.S.C. § 2000cc-1(a) and 42 U.S.C. § 1997.

79. Patuxent receives federal financial assistance within the meaning of 42 U.S.C. § 2000cc-1(a) and 42 U.S.C. § 1997.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Corey Lee Dove requests from this Court:

A. A declaration that the conduct described herein violated Plaintiff's rights under the Constitution and laws of the United States.

B. Equitable relief ordering Defendant Warden Armstead in her official capacity to stop Patuxent Institution from substantially burdening Native American religious exercise and to relinquish items for Native American religious services sent to Patuxent so that the items may be used by inmates desiring to employ them in Native American religious exercise.

C. An award of appropriate compensatory damages in favor of Plaintiff Corey Lee Dove and against Defendants Warden Laura Armstead, Sergeant Jason Anderson, John Doe 1, and John Doe 2 in their individual capacities;

D. An order directing Defendants to pay all of Plaintiff's attorneys' fees and costs associated with the preparation and prosecution of this action; and

E. Any such other relief as the court deems to be just and equitable.

Dated: February 16, 2021                                        Respectfully submitted,

                                                                By:   */s/ Catie Ventura*
                                                                      Catie Ventura, Bar No. 19848
                                                                      John Patrick Bailey (*Pro Hac Vice*)
                                                                      KIRKLAND & ELLIS LLP
                                                                      1301 Pennsylvania Avenue, N.W.
                                                                      Washington, D.C. 20004
                                                                      Telephone: +1 202 389 5000
                                                                      Facsimile: +1 202 389 5200
                                                                      john.bailey@kirkland.com
                                                                      catie.ventura@kirkland.com

                                                                      *Attorneys For Plaintiff Corey Lee Dove*