IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

COREY LEE DOVE

     v.

PATUXENT FACILITY, et al.

                       :
                       :
                       : Civil Action No. DKC 18-1847
                       :
                       :

## MEMORANDUM OPINION

Presently pending and ready for resolution in this prisoner civil rights case is a motion to dismiss or, in the alternative, for summary judgment by Defendants Laura Armstead and Jason Anderson ("Defendants").[1] (ECF No. 42). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the motion will be treated as one to dismiss and will be granted in part and denied in part.

## I.  Factual Background

Corey Lee Dove is a member of the Lakota Sioux tribe and practices Lakota religious traditions. (ECF No. 41, ¶¶ 18-19). The Lakota "system of spirituality center[s] on Wakan Tanka, often translated as the Great Spirit or Great Mystery." (*Id.*, ¶ 19).

---

[1] Mr. Dove also sues two unidentified corrections officers, named in his amended complaint as John Doe 1 and John Doe 2. "Defendants," as used throughout this opinion, refers only to Warden Armstead and Sgt. Anderson. More specific language is used when referring to all four defendants or some other combination.

Two rituals "central to practicing Lakota religious traditions" are at issue here: conveying prayers through a sacred pipe known as Chanupa Wakan and conducting the sacred rite known as the Keeping of the Soul when a loved one dies.  (*Id.*, ¶¶ 20-21).  The Chanupa Wakan serves as the principal bridge between worshippers and Wakan Tanka.  (*Id.*, ¶ 20).  The Keeping of the Soul is necessary to "purify the souls of [the] dead" and allow them to return to Wakan Tanka, rather than wander the earth.  (*Id.*, ¶ 21).

Involvement in these rituals is "fundamental" to Lakota followers.  (*See* ECF No. 41, ¶ 19).  Both must be performed in a "specific setting" involving "a pike carrier who knows the customary prayers; instruments and felt cloths of particular colors; sacred herbs, such as sweetgrass, sage, and tobacco; and a group of worshippers encircling a small fire."  (*Id.*, ¶ 22).  Mr. Dove alleges that Defendants—Warden Laura Armstead and former Property Room Sergeant Jason Anderson, and two unidentified corrections officers ("Defendants Doe")—denied him "the ability to meaningfully engage" in the rituals, including by preventing him from performing the Keeping of the Soul rite when his mother and sister died in February and March 2018, and retaliated against him when he complained.  (*Id.*, ¶¶ 1, 4, 46).

During the relevant period, Defendants were employed at the Patuxent Institution ("Patuxent"), a state correctional facility in Jessup, Maryland.  (ECF No. 41, ¶¶ 7-11, 25).  Mr. Dove was

2

transferred to Patuxent in October 2017.  (*Id.*, ¶ 24).  He quickly asked to facilitate Native American religious services.  (*Id.*, ¶ 26).  Defendant Anderson and Defendants Doe responded by ridiculing his Native American garb, "mocking Native American culture with caricatured noises," and telling him he "would never be able" to hold services.  (*Id.*, ¶¶ 27, 39).  Mr. Dove escalated his request by filing an Administrative Remedy Procedure complaint ("ARP") in November 2017 and it was granted in or about December 2017.  (*Id.*, ¶ 28).

Mr. Dove and his fellow Native American worshippers often were not able to complete the rituals after Mr. Dove's request was approved.  Irritated by accommodating the worshippers, Defendants Doe "repeatedly delayed the Native American faith group from going outside" to complete their services.  (ECF No. 41, ¶¶ 32, 34).  Pressed for time, the group could not "properly recite prayers[] or otherwise satisfactorily engage in their religious exercises." (*Id.*, ¶¶ 31, 34).  Defendants Doe also "repeatedly and extensively strip-searched every single member of the faith group . . . after they returned from their religious services."  (*Id.*, ¶ 35).  Mr. Dove alleges that "inmates of other religious faiths who participated in other religious group worship [] were not delayed to the point of precluding their religious exercise and [] were not strip-searched every time" they held services.  (*Id.*, ¶ 36).

In January 2018, Mr. Dove filed another ARP "complaining of the delays that correctional officers imposed." (ECF No. 41, ¶ 37). In February and March, Mr. Dove and his faith group were not permitted to hold "any services" for three consecutive weeks. (*Id.*, ¶ 38). Mr. Dove was told the ban was "due to an altercation on [his] tier that was not related to him[.]" (*Id.*). Around the same time, Defendants Doe "would not permit Mr. Dove to wear his ceremonial Native American headgear[.]" (*See id.*, ¶ 39). Mr. Dove alleges that inmates of other faiths "were permitted to wear religious head garb[.]" (*Id.*, ¶ 40). Defendant Anderson also began refusing access to "items necessary for the Lakota faith group's services" that Mr. Dove and other group members had ordered or were donated by "outside Native American persons or religious organizations[.]" (*Id.*, ¶ 41). Before Mr. Dove filed his January ARP, the group was allowed to receive religious items delivered to Patuxent. (*Id.*). Mr. Dove filed new ARPs and, in response, Defendant Anderson attacked the sincerity of his faith, accusing him of being a "crybaby" and "faking" his beliefs. (*Id.*, ¶¶ 42-43). Mr. Dove alleges that inmates of other faiths "were permitted to access" religious items delivered to Patuxent. (*Id.*, ¶ 44).

In May 2018, while Mr. Dove had ARPs pending, and while his ability meaningfully to hold services faced ongoing challenges, Defendant Armstead convened a meeting with, among others, Defendant Anderson. (ECF No. 41, ¶¶ 7, 49, 51). Warden Armstead

instructed attendees "to refrain from taking any additional actions directed at the Native American faith group and that she would 'handle it.'" (*Id.*, ¶ 52). Two weeks later, Mr. Dove was transferred from Patuxent. (*Id.*, ¶¶ 7, 53). Mr. Dove alleges that at least three other members of the Native American faith group were transferred out of Patuxent around the same time. (*Id.*, ¶¶ 53-54). He further alleges that "Native American religious services" have not been held at Patuxent since his transfer. (*Id.*, ¶ 55).

## II. Procedural Background

Mr. Dove filed suit *pro se* in this court on June 21, 2018. (ECF No. 1). Two motions for summary judgment were adjudicated and discovery was ordered, contingent on appointment of counsel for Mr. Dove. (ECF Nos. 13; 14; 20; 21). After *pro bono* counsel was identified, however, the parties agreed to a schedule, approved by this court, that permitted Mr. Dove to file an amended complaint and Defendants to file a dispositive motion before proceeding to discovery. (ECF Nos. 37; 38). Mr. Dove's amended complaint was docketed in February 2021. (ECF No. 41). Proceeding under 42 U.S.C. § 1983 and 42 U.S.C. § 2000cc *et seq.*, he brings three claims alleging violations of: (1) the Free Speech Clause, (2) the Equal Protection Clause, and (3) the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). (*Id.*, at 14-16). Mr. Dove requests declaratory relief, injunctive relief against Warden

Armstead in her official capacity, compensatory damages from all Defendants in their individual capacities, and attorneys' fees. (*Id.*, at 17-18).

Defendants filed a motion to dismiss or, in the alternative, for summary judgment.  (ECF No. 42).[2]   Mr. Dove opposed and Defendants replied.  (ECF Nos. 45; 46).  Defendants argue that Mr. Dove either does not have standing to bring his RLUIPA claim or that his claim is now moot.  (ECF Nos. 42-1, at 10; 46, at 2-3).[3] Defendants also argue that Mr. Dove does not adequately allege or show that he meets the requirements for the RLUIPA, free-speech retaliation, and equal protection claims.  (ECF Nos. 42-1, at 11-20; 46, at 3-4).

## III. Standard of Review

Ordinarily, summary judgment is inappropriate if "the parties have not had the opportunity for reasonable discovery."  *E.I. du*

---

[2] While Defendants pay lip service to the different standards applicable to each aspect of their motion, they then ignore any distinction and proceed, in their legal analysis, to meander between the two.  This amorphous approach is ill-conceived and, unfortunately, makes proper analysis difficult, if not impossible. Counsel would be well-advised not to combine arguments in this very unhelpful fashion.

[3] Plaintiff argues that Defendants' mootness argument was forfeited because it wasn't included in their underlying motion. (ECF No. 45, at 18 n.7).  Mootness is nevertheless addressed here because, as raised, it is a jurisdictional issue that "may not be ignored[.]"  *Incumaa v. Ozmint*, 507 F.3d 281, 286 (4th Cir. 2007) (citation omitted).  Defendants' mootness argument also overlaps completely with their redressability argument on standing.

*Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011). Rule 56(d) allows the court to deny a motion for summary judgment or delay ruling on the motion until discovery has occurred if the "nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56(d). Non-movants' oppositions to summary judgment under Rule 56(d) "are broadly favored and should be liberally granted in order to protect [non-movants] from premature summary judgment motions." *McCray v. Md. Dep't of Transp.*, 741 F.3d 480, 484 (4th Cir. 2014) (quotation omitted).

The Fourth Circuit places "great weight" on the affidavit requirement. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996). "Rule 56(d) affidavits cannot simply demand discovery for the sake of discovery." *Hamilton v. Mayor of Baltimore*, 807 F.Supp.2d 331, 342 (D.Md. 2011) (quotation omitted). A non-moving party's Rule 56(d) request for discovery is properly denied where "the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Ingle ex rel. Estate of Ingle v. Yelton*, 439 F.3d 191, 195 (4th Cir. 2006) (quotation omitted).

Mr. Dove's counsel submitted a Rule 56(d) affidavit on Mr. Dove's behalf identifying the evidence Mr. Dove requires to pursue his claims. (ECF No. 45-4). The list is extensive and detailed.

7

As just one example, Mr. Dove's counsel argues that he would seek discovery regarding the application to other religious groups—and to Mr. Dove before he filed his ARPs—of Patuxent's policy governing access to delivered property. (*Id.*, at 4). Mr. Dove argues that discovery would reveal that delivery of certain items was not categorically barred (as claimed), that prisoners were routinely allowed to receive orders made through approved vendors on their behalf, and that Defendant Anderson did not consult with the Staff Chaplain before he denied Mr. Dove access to his religious items. (ECF No. 45, at 11-13).

"[Rule] 56(d) motions for more time to conduct discovery are proper in cases . . . where the main issue is one of motive and where most of the key evidence lies in the control of the moving party." *McCray*, 741 F.3d at 484. The evidence Mr. Dove seeks to discover satisfies both requirements. If available, it would be essential to Mr. Dove's ability to shed light on Defendants' motives and demonstrate that the reasons given for their actions are false or pretextual. The information is also in Patuxent's sole control. Moreover, this court already ordered discovery on the retaliation claim as included in the prior complaint. (ECF No. 21).

Defendants' motion, therefore, will be reviewed as one to dismiss. Their subject matter jurisdiction argument is analyzed under Fed.R.Civ.P. 12(b)(1). *See Ross-Randolph v. Allstate Ins.*

*Co.*, No. 99-cv-3344-DKC, 2001 WL 36042162, at *2 (D.Md. May 11, 2001).   Questions of subject matter jurisdiction must be decided first because they concern the court's authority to hear the case. *Va. Dep't of Corr. v. Jordan*, 921 F.3d 180, 187 (4th Cir. 2019). The plaintiff bears the burden of proving that subject matter jurisdiction exists.   *Demetres v. East West Constr., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015).   When defendants challenge subject matter jurisdiction facially, as here, the plaintiff "is afforded the same procedural protection" as under Rule 12(b)(6).   *Wikimedia Found. v. NSA*, 857 F.3d 193, 208 (4th Cir. 2017) (quotation omitted).   "[T]he motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009).

Defendants' other arguments are reviewed under Fed.R.Civ.P. 12(b)(6).   A 12(b)(6) motion tests the sufficiency of the complaint.   *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).   "[T]he district court must accept as true all well-pleaded allegations and draw all reasonable factual inferences in plaintiff's favor." *Mays v. Sprinkle*, 992 F.3d 295, 299 (4th Cir. 2021).   A plaintiff's complaint need only satisfy the standard of Fed.R.Civ.P. 8(a)(2), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief[.]"   A Rule 8(a)(2) "showing" still requires more than "a blanket assertion[] of entitlement to relief," *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 555 n.3 (2007), or "a formulaic recitation of the elements of a cause of action[.]"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that defendant is liable for the misconduct alleged."  *Mays*, 992 F.3d at 299-300 (quoting *Iqbal*, 556 U.S. at 663).

## IV.   Subject Matter Jurisdiction

### A.   Standing

"Article III standing is part and parcel of the constitutional mandate that the judicial power of the United States extend only to 'cases' and 'controversies.'"  *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 252 (4th Cir. 2020) (quotation omitted).  "[T]he standing inquiry asks whether a plaintiff had the requisite stake in the outcome of a case at the outset of the litigation," when the original complaint was filed.  *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 187 (4th Cir. 2018) (quotation omitted); *see Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1275 (11th Cir. 2003) (collecting cases).  "To establish individual standing, a plaintiff must demonstrate that it [] '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'"  *Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 210 (4th Cir. 2020) (quoting *Spokeo,*

10

*Inc. v. Robins*, 136 S.Ct. 1540, 1547 (2016)).  These three elements are "the irreducible constitutional minimum of standing[.]" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  Although Defendants make traceability and redressability arguments, only the former is addressed in this section.  The redressability argument overlaps substantially with, and is more easily addressed as part of, the Defendants' mootness argument.

"For an injury to be traceable, there must be a causal connection between the injury and the conduct complained of by the plaintiff." *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 760 (4th Cir. 2018) (quotation omitted).  "While the defendant's conduct need not be the last link in the causal chain, the plaintiff must be able to demonstrate that the alleged harm was caused by the defendant, as opposed to the independent action of some third party not before the court." *Id.* (quotation omitted).

Mr. Dove meets this requirement.  The causation here is direct; the challenged conduct is the last and only link in the chain.  Mr. Dove alleges that his religious exercise was burdened by Defendant Anderson and Defendants Doe when they, among other actions, subjected him to unnecessary strip searches, delayed his group services, and prohibited him from accessing necessary religious items. (ECF No. 41, ¶¶ 34-35, 41).  Defendants address only Mr. Dove's access to religious items and confuse the threshold causation analysis with the merits.  That prison policy may not

11

have permitted the items to enter the Patuxent facility, (ECF No. 42-1, at 10), might support finding a compelling governmental interest, but is irrelevant to finding causation.  Mr. Dove's RLUIPA claims will not be dismissed for lack of standing.

**B.   Mootness**

"Unlike standing, which is determined at the commencement of a lawsuit, subsequent events can moot an otherwise validly raised claim.  A case becomes moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Deal*, 911 F.3d at 191 (cleaned up).  Put another way, a case is moot when any of the essential elements of a case or controversy "cease[] to exist[.]" *See S.C. Coastal Conservation League v. U.S. Army Corps of Eng'rs*, 789 F.3d 475, 482 (4th Cir. 2015) (citation omitted); *Townes v. Jarvis*, 577 F.3d 543, 546-47 (4th Cir. 2009) (citation omitted).  Courts retain jurisdiction, however, over otherwise moot claims if an exception applies. Exceptions include claims that are made moot because a defendant voluntarily ceases the challenged conduct or are "capable of repetition yet evad[e] review." *Bd. of Educ. for Montgomery Cnty. v. Khan*, No. 04-cv-2365-DKC, 2005 WL 2250796, at *3 (D.Md. Sept. 15, 2005) (citations omitted).  These exceptions are necessary to ensure that defendants cannot avoid review, and repeatedly engage in unlawful conduct, through their own designs or other circumstances. *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013).

Defendants challenge the redressability of Mr. Dove's RLUIPA injury.  For an injury to be redressable, "it must be likely, and not merely speculative, that a favorable decision will remedy the injury."  *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 154 (4th Cir. 2000) (citation omitted).  "The burden imposed by this requirement is not onerous.  Plaintiffs need not show that a favorable decision will relieve their every injury."  *Deal*, 911 F.3d at 189 (cleaned up).  They "need only show that they personally would benefit in a tangible way from the court's intervention."  *Id.* (quotation omitted).  This requirement applies to "each claim and form of requested relief[.]"  *Md. Shall Issue*, 971 F.3d at 209 (quotation omitted).

Mr. Dove requests declaratory and injunctive relief under RLUIPA (and not under his Section 1983 claims).  For the injunctive relief, he requests two orders against Defendant Armstead in her official capacity, one requiring Patuxent to stop "substantially burdening Native American religious exercise," and another requiring Patuxent "to relinquish items for Native American religious services . . . so that the items may be used by inmates desiring to employ them in Native American religious exercise." (ECF No. 41, at 17).  For the latter, Mr. Dove requests that the items be returned "either to him, if possible, or to the custody of the person of his choosing."  (ECF No. 45, at 19).  He does not, and cannot, request compensatory damages under RLUIPA because

13

the statute does not make them available.  *Ellis v. Lassiter*, 848 F.App'x 555 (Mem) (4th Cir. 2021) (unpublished) (citation omitted). He contends that his requested relief will redress the substantial burden imposed by Defendants on his religious exercise by "reclaim[ing] the wrongfully confiscated religious items and [protecting] against his religious exercise being substantially burdened while he remains in Division of Corrections custody." (ECF No. 45, at 19).

**1.   Declaration and Order to Cease Burdens at Patuxent**

Mr. Dove's injuries would not be redressed by the requested declaratory relief or injunction requiring Warden Armstead to discontinue practices at Patuxent.  This case is controlled by *Incumaa v. Ozmint* which held that "the transfer of an inmate from a unit or location where he is subject to the challenged policy, practice, or condition, to a different unit or location where he is no longer subject to the challenged policy, practice, or condition moots his claims for injunctive and declaratory relief[.]"  507 F.3d 281, 286-87 (4th Cir. 2007).  As there, the relief "would have no practical impact on [Mr. Dove's] rights and would not redress in any way [his] injur[ies.]"  507 F.3d at 287. The relief would only change conditions at Patuxent.  Mr. Dove no longer resides there and is not subject to its policies or practices.  The relief would have no effect on the policies and practices Mr. Dove faces at other facilities.  He also does not

14

face any meaningful risk of return to Patuxent – he was transferred more than two years ago and was recently assigned to another new facility, (ECF No. 45, at 4).

Patuxent's alleged conduct also does not fall into the "voluntary cessation" or "capable of repetition, yet evading review" exceptions to mootness.  First, Patuxent did not voluntarily end its conduct to cut this litigation off because Mr. Dove sued after he was transferred.  Second, the Department of Public Safety and Correction Services' ("DPSCS") mere ability to return Mr. Dove to Patuxent at any time does not create a "reasonable expectation that the wrong will be repeated[.]" *Incumaa*, 507 F.3d at 288-89.

If anything, Mr. Dove stands in a worse position than the plaintiff in *Incumaa v. Ozmint* because he filed suit after he was transferred out of Patuxent.  (ECF Nos. 1; 41, ¶ 7).  The Fourth Circuit noted that if Mr. Incumaa had done the same, "[t]here is little question that . . . [it] would have dismissed that case for lack of standing."  *Incumaa*, 507 F.3d at 288.  Even if Mr. Dove could have shown that the relevant relief was likely to redress a risk of future injury at the outset of this litigation, he cannot do so today, more than two years later.

Mr. Dove's requests for declaratory relief and an injunction requiring Warden Armstead to end ongoing burdens on Native American religious practice at Patuxent will be dismissed as moot.

## 2.   Order to Return Religious Items

Mr. Dove's injuries would likely be redressed, at least in part, by the requested injunction requiring Defendant Armstead to return the Lakota religious items to him.  An order from this court requiring Warden Armstead to relinquish the items could be enforced and would remedy harms Mr. Dove continues to suffer.   Mr. Dove alleges that Patuxent retains possession of the items.  (ECF No. 41, ¶ 55).  His amended complaint also suggests that he remains without access to the religious items today and has not been able to replace them.  (*See id.*, ¶¶ 45-46).  Indeed, he "still has not been able to perform the Keeping of the Soul ritual" for his mother and sister.  (*Id.*).   The burden on his religious exercise is therefore ongoing even though he no longer resides at Patuxent. The order would remedy this continuing burden whether Mr. Dove frames his inability to access necessary religious items as an independent burden on his religious exercise or as one stemming from the combined effect of all the allegedly burdensome conduct. *See Uzuegbunam v. Preczewski*, 141 S.Ct. 792, 801 (2021) ("[T]he ability to effectuate a partial remedy satisfies the redressability requirement." (quotation omitted)).

Mr. Dove's request to have his religious items relinquished to him will not be dismissed on standing or mootness grounds.  This conclusion hinges, however, on two alleged facts: Patuxent's possession of the items and on Mr. Dove's continued inability to

replace or otherwise access the same types of religious items that he was denied at Patuxent.  His request would be moot if either allegation were untrue because he would not have an ongoing injury and any past injury would no longer be redressable.  And, Mr. Dove cannot fall back on any property interest he has in the items to establish a live RLUIPA claim.  Prisoner loss-of-property claims must be adjudicated in state court.  *Johnson v. Kretzer*, No. 17-cv-2419-GJH, 2020 WL 1082772, at *5 (D.Md. Mar. 6, 2020).

## V.    RLUIPA

Under RLUIPA, the government shall not "impose a substantial burden on the religious exercise of a person residing in or confined to an institution" unless doing so furthers a compelling government interest by the least restrictive means.  42 U.S.C. § 2000cc-1(a).  To state a RLUIPA claim, a plaintiff must allege (1) a substantial burden on his exercise of (2) a sincerely held religious belief.  *Jehovah v. Clarke*, 798 F.3d 169, 179 (4th Cir. 2015) (citing 42 U.S.C. § 2000cc-2(b)); *see also Holt v. Hobbs*, 574 U.S. 352, 360-61 (2015).  Defendants do not challenge the sincerity of Mr. Dove's beliefs.

"[A] substantial burden on religious exercise occurs when a state or local government, through act or omission, puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jehovah*, 798 F.3d at 179 (quoting *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006)).  This includes conduct

17

that denies a prisoner the opportunity to participate in a religious practice, "tends to force adherents to forgo religious precepts," or "render[s] religious exercise . . . effectively impracticable." *Lovelace*, 472 F.3d at 187 (quotations omitted). Although the practice at issue does not need to be "required or essential," the prison's conduct must amount to "more than an inconvenience[.]" *Tillman v. Allen*, 187 F.Supp.3d 664, 673 (E.D.Va. 2016) (quotations omitted). At the motion-to-dismiss stage, this is not a high bar; it is sufficient to allege that a prisoner's "religious practices were chilled" by the challenged conduct. *Jehovah*, 798 F.3d at 180. The prison's conduct must be intentional but need not be motivated by religious animus. *See Lovelace*, 472 F.3d at 194. That the prison accommodates other religious practices is irrelevant. *Holt*, 574 U.S. at 361-62.[4]

Mr. Dove easily pleads a substantial burden. There can be little doubt that the alleged conduct here not only would have chilled Mr. Dove's religious practice, but also made it impractical

---

[4] Defendants are wrong to argue that Mr. Dove had to plead that he felt pressured to modify, or in fact modified, his behavior. (ECF No. 42-1, at 13). To the extent they rely on *Krieger v. Brown*, an unpublished, non-precedential, decision, it stands at most for the proposition that, at summary judgment, a plaintiff must offer more than conclusory statements that his preferred method for engaging in a religious practice is "necessary" to establish that alternative methods are not adequate substitutes. *See* 496 F.App'x 322, 325-26 (4th Cir. 2012) (unpublished). The standard on a motion to dismiss is more forgiving.

or impossible to conduct the Chanupa Wakan or Keeping of the Soul. The verbal harassment and strip searches imposed emotional and physical harms for conducting the rituals.  Withholding necessary items, delaying group services (thereby restricting the time available to conduct them), and prohibiting the use of religious headgear all made it at least more difficult for Mr. Dove to conduct the rituals as dictated by the Lakota faith.  It was impossible for Mr. Dove to conduct the rituals when he and his faith group were barred from doing so.  Other plaintiffs have successfully pleaded RLUIPA claims for less.  *See Jehovah*, 798 F.3d at 180 (cellmate subjected him to "'anti-Christian' rhetoric" that "mocked[] and harassed" him because of his religious views). And Mr. Dove does not allege—nor do Defendants assert—that he could have avoided the harms and restrictions, or that alternative means of carrying out the rituals were offered.  *See Incumaa v. Stirling*, 791 F.3d 517, 525-26 (4th Cir. 2015) (considering means of avoiding challenged burden).

The result is the same even if Mr. Dove relies solely on Defendant Anderson's withholding of religious items.  As discussed above, Mr. Dove's lack of access continues to chill his religious exercise.  Mr. Dove's case is different from *Krieger v. Brown*, which held that a prisoner failed to demonstrate at summary judgment that a prison's denial of requested sacred items substantially burdened his religious exercise.  496 F.App'x 322,

326 (4th Cir. 2012).   Unlike *Krieger*, Mr. Dove identified the rituals at issue and explained how at least some of the sacred items are incorporated into those rituals.   *See id.*   Tobacco, for example, is necessary to smoke the sacred pipe, Chanupa Wakan. (*See* ECF No. 41, ¶¶ 20-22).

Mr. Dove's RLUIPA claim will not be dismissed for failure to state a claim.

## VI.   Free Speech Clause

"The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000) (citation omitted).   While prisoners' constitutional rights are more limited in scope than those of individuals in society at large, they retain the "right to file a prison grievance free from retaliation." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 545 (4th Cir. 2017).   Such claims must nevertheless "be regarded with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in state penal institutions." *Hoye v. Gilmore*, 691 F.App'x 764, 765 (4th Cir. 2017) (unpublished) (quoting *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994)). Ultimately, a prisoner must establish a *prima facie* case that allegedly retaliatory action was taken because of his protected activity.   The burden then shifts to the defendant to rebut a

presumption of retaliation by proving, in most cases, that he "would have reached the same decision . . . in the absence of the protected conduct." *Martin v. Duffy*, 977 F.3d 294, 298-304 (4ᵗʰ Cir. 2020) (*Martin II*) (quotation omitted).

To state a claim for free-speech retaliation, a prisoner must allege that "(1) he engaged in protected First Amendment activity, (2) the defendant took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between his protected activity and the defendant's conduct." *Martin v. Duffy*, 858 F.3d 239, 249 (4ᵗʰ Cir. 2017) (*Martin I*) (cleaned up) (quoting *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4ᵗʰ Cir. 2005)). Defendants do not challenge that Mr. Dove's ARPs were protected speech or that Warden Armstead took adverse actions, either individually when she transferred Mr. Doe or vicariously through her supervision of Defendant Anderson or Defendants Doe.

**A.  Adverse Action**

A plaintiff pleads an adverse action if he alleges that the defendant took an action that would "deter 'a person of ordinary firmness' from the exercise of First Amendment rights." *Martin I*, 858 F.3d at 249 (quoting *Constantine*, 411 F.3d at 500). Defendant Anderson acted adversely against Mr. Dove when he allegedly "refus[ed] access to Lakota religious items," (ECF No. 41, ¶ 41). An act that substantially burdens an individual's religious

exercise might deter an ordinary person from filing complaints. *E.g.*, *Woodward v. Ali*, No. 13-cv-1304-LEK/DJS, 2018 WL 4190139, at *8 (N.D.N.Y. Aug. 10, 2018). However, Sgt. Anderson did not take an adverse action when he allegedly derided Mr. Dove and his fellow worshippers as "crybabies" and "accused them of 'faking' their religious beliefs as an excuse to smoke tobacco." (ECF No. 41, ¶ 43). These comments are too trivial to "deter a person of ordinary firmness" from filing grievances. *See Barton v. Clancy*, 632 F.3d 9, 29-30 (1st Cir. 2011); *see also Long v. Hammer*, 727 F.App'x 215, 217 (7th Cir. 2018) (unpublished).

### B. Causal Relationship

A plaintiff can successfully plead causation where he alleges enough facts from which to infer that there was "temporal proximity" between the alleged adverse action and the plaintiff's First Amendment activity and that the defendant was aware of the protected activity. *Constantine*, 411 F.3d at 501.

Mr. Dove pleaded enough facts from which to infer that both Defendant Anderson and Defendant Armstead (or those she supervised) took adverse actions because Mr. Dove filed ARP grievances. Sgt. Anderson allegedly withheld the religious items within two-to-three months of one of Mr. Dove's ARPs, if not closer in time. That is enough. *Clark v. Daddysman*, No. 16-cv-0921-TDC, 2018 WL 1453333, at *13 (D.Md. Mar. 22, 2018) (citing *Constantine*, 411 F.3d at 501). Mr. Dove alleges that he began filing ARPs in

November 2017.  (ECF No. 41, ¶¶ 28-29).  Mr. Dove filed at least one ARP between December and being prohibited from worshipping for three weeks beginning in February 2018.  (*See id.*, ¶¶ 37-38).  His April grievance suggests Sgt. Anderson began withholding the items in February.  (ECF No. 42-5, at 12).[5]

Sgt. Anderson also allegedly knew about the grievances. First, his alleged knowledge of Mr. Dove's initial informal requests to start a worship group suggests that he generally was aware of Mr. Dove's efforts to ensure Patuxent accommodated his religious worship.  (ECF No. 41, ¶¶ 26-27).  Second, Mr. Dove alleges that Sgt. Anderson knew about later ARPs complaining about his withholding religious items.  (*Id.*, ¶ 43).  Furthermore, Mr. Dove alleges that when Sgt. Anderson learned of those complaints, he called members of the Lakota faith group "crybabies" in response.  (*Id.*).  The hostility toward filing grievances evident from that comment alone supports a causal inference.

Warden Armstead also allegedly transferred Mr. Dove shortly after he filed ARPs that she knew about.  Mr. Dove allegedly filed an ARP on or about May 16, 2018, (ECF No. 42-5, at 2), and was

---

[5] Attached documents "integral to the complaint and authentic" may be considered on a motion to dismiss.  *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).  Mr. Dove's ARPs are referenced in his amended complaint and are essential to his retaliation claim.  He does not object to their authenticity and they have been considered by this court in prior decisions, (*e.g.*, ECF No. 13, at 5-6).

transferred from Patuxent on May 28. (ECF No. 41, ¶ 7). According to the amended complaint, Warden Armstead held a meeting less than two weeks before Mr. Dove was transferred to discuss "Mr. Dove's persistence in pursuing his rights through the ARP process" and told attendees "to refrain from taking any additional actions directed at the Native American faith group" because "she would 'handle it.'" (*Id.*, ¶ 51-53). In other words, Warden Armstead decided simultaneous to Mr. Dove's May 2018 ARP to transfer him and knew about the ARPs because she held a meeting to discuss them.

The meeting also supports an inference that Warden Armstead endorsed her supervisees' retaliation against Mr. Dove, although Defendants do not argue that Mr. Dove failed to plead supervisory liability. *See Pratt-Miller v. Arthur*, 701 F.App'x 191, 193 (4th Cir. 2017) (unpublished) (citing *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (describing "supervisory liability" when sued in individual capacity under Section 1983). Sgt. Anderson and Defendants Doe allegedly attended, and Warden Armstead acknowledged her awareness and tacit support for their prior retaliation by telling them to "refrain" going forward so she could handle things.

Mr. Dove's Section 1983 free-speech retaliation claim will not be dismissed for failure to state a claim.

## VII. Equal Protection Clause

The Equal Protection Clause of the Fourteenth Amendment declares that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. It is "essentially a direction that all persons similarly situated should be treated alike." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 606 (4th Cir. 2020) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). Mr. Dove alleges discrimination based on a suspect classification – his status as a Native American religious worshipper. *See Giarratano v. Johnson*, 521 F.3d 298, 303 (4th Cir. 2008) (citation omitted) (suspect classes include race and religion). Prison practices that impinge on equal protection rights may nevertheless be valid if reasonably related to a legitimate penological interest. *Morrison v. Garraghty*, 239 F.3d 648, 654-55 (4th Cir. 2001) (citing *Turner v. Safley*, 482 U.S. 78, 84 (1987)).

"In order to survive a motion to dismiss an equal protection claim, a plaintiff must plead sufficient facts to demonstrate plausibly that he was treated differently from others who were similarly situated and that the unequal treatment was the result of discriminatory animus." *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 238 (4th Cir. 2021) (quotation omitted). Prisoners must also plausibly allege that the different treatment was not valid because it "was not reasonably related to any

25

legitimate penological interests." *Fauconier v. Clarke*, 966 F.3d 265, 277 (4th Cir. 2020) (cleaned up).[6]

## A.   Differential Treatment from Others Similarly Situated

It is not enough for plaintiffs to make conclusory allegations of differential treatment or similarly situated comparators. *Sheppard*, 993 F.3d at 237-38; *Hodge v. Coll. of S. Md.*, 121 F.Supp.3d 486, 501 (D.Md. 2015). They must, at a minimum, identify (though not necessarily by name) who was treated differently than they were and how. *See id.; Jones v. Bishop*, No. 16-cv-2893-CCB, 2018 WL 1521874, at *15 (D.Md. Mar. 28, 2018). *But see Swanson v. City of Chetek*, 719 F.3d 780, 781-83 (7th Cir. 2013) (requiring less in class-of-one cases). They also must allege enough about their own status and the status of comparators to support an inference that they are similarly situated in relevant respects. *Desper v. Clarke*, 1 F.4th 236, 249 (4th Cir. 2021).

Mr. Dove meets this requirement, but nearly falls short. He clearly identifies how he was treated differently. He was subjected to unnecessary strip searches; his group services were delayed and temporarily prohibited; he was not allowed to wear religious headwear or receive sacred religious items that were

---

[6] This pleading requirement is problematic. Outside prison, courts presume that any government action that directly interferes with core liberties is not justified and therefore is invalid. The government bears the burden to justify its actions in such cases. The pleading requirement here directly conflicts with that system of presumptions and burdens.

ordered for him; and he was transferred from Patuxent. (ECF No. 41, ¶¶ 34-35, 38-39, 41, 48, 50-55). He alleges that comparators did not experience any of this treatment. (*Id.*, ¶¶ 36, 40, 44, 67, 70).

Mr. Dove does not, however, clearly identify any specific person or group as similarly situated. He instead refers only to "similarly situated inmates of other religious faiths" and "similarly situated inmates of other faiths who participated in other religious group worship." (*E.g.*, ECF No. 41, ¶¶ 36, 40). Alone, that would not be enough. But, together with the nature of the animus he alleges, it is. At core, Mr. Dove alleges that the four Defendants were hostile to all Native-American-faith adherents, because they were bigoted against Native Americans, believed their religion was made up, or were annoyed by accommodating their services, as discussed below.

Mr. Dove's amended complaint is therefore construed to assert that the four Defendants singled out Native American religious worshippers and afforded **all** other religious observers the accommodations they needed without obstruction. More to the point, the amended complaint is construed to allege that no other religious group had rituals repeatedly delayed or banned for three weeks, was strip searched after every religious service, was not allowed access to necessary religious items or wear religious headwear, or had its members transferred out of Patuxent *en masse*.

27

If true, such allegations would implicate the heart of the Equal Protection Clause and will survive at the motion-to-dismiss stage. *See Fauconier*, 966 F.3d at 278.

**B. Discriminatory Intent**

To plead that a government practice violates the Equal Protection Clause, a plaintiff must allege discriminatory intent or purpose. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977); *Townes v. Jarvis*, 577 F.3d 543, 552 (4th Cir. 2009). This is a "sensitive inquiry into such circumstantial and direct evidence" available. *Arlington Heights*, 429 U.S. at 564. Relevant facts may include contemporary statements by the defendants, the sequence of events leading up to a challenged decision (such as sudden departures from past practice), and the relative impact of an action across individuals, particularly if accompanied by a clear pattern of conduct "unexplainable" on other grounds. *Id.* at 564-65. "Bald and conclusory assertions of discriminatory animus are insufficient to state an Equal Protection claim." *Jones*, 2018 WL 1521874, at *14 (citing *Beaudett v. City of Hampton*, 775 F.2d 1274 (4th Cir. 1985)); *see also Sheppard*, 993 F.3d at 238.

Alleged comments made by all four Defendants suggest either racial animus against Native Americans or religious animus against worshippers of Native American faiths. Defendant Anderson and Defendants Doe allegedly "ridicul[ed] Mr. Dove for wearing

28

traditional Native American clothing[] [and] mock[ed] Native American culture with caricatured noises[.]" (ECF No. 41, ¶ 27). Defendants Doe allegedly ridiculed Mr. Dove's ceremonial headgear "because it was the color purple and adorned with feathers." (*Id.*, ¶ 39). Defendant Anderson allegedly "derided the Lakota faith group as 'crybabies' and accused them of 'faking' their religious beliefs as an excuse to smoke tobacco." (*Id.*, ¶ 43). Warden Armstead allegedly endorsed the campaign of mistreatment. (*See id.*, ¶ 52).

Both the sequence of the four Defendants' actions and the singular impact their actions allegedly had on Native American worshippers point in the same direction. For instance, Mr. Dove alleges that the faith group was initially allowed access to religious items delivered to Patuxent. (ECF No. 41, ¶¶ 41-42). Nothing relevant to the prison's personal-property delivery policy had changed when Sgt. Anderson suddenly began blocking access to those items. (*See id.*). Mr. Dove also alleges that all Native American worshippers received the same treatment as he did. No "follower of Lakota or any other Native American spiritual tradition[]" received religious items delivered to Patuxent after Sgt. Anderson's position changed. (*Id.*, ¶¶ 41-43, 45). Other members of the faith group were also transferred around the same time he was, leaving Patuxent without any Native American religious services. (*Id.*, ¶¶ 54-55). It is difficult, though not

impossible, to imagine why Native American worshippers were so singled out.

## C.   Legitimate Penological Interest

On a motion to dismiss an equal protection claim, courts look to three of the four *Turner* factors to assess possible rationales for a prison's conduct.  Those are: (1) the existence of "a valid, rational connection between" the prison conduct and a legitimate penological interest; (2) the impact that accommodating the claim for equal protection will have "on guards and other inmates, and on the allocation of prison resources generally"; and (3) the availability of "ready alternatives," an absence of which supports finding prison conduct valid.  *Fauconier*, 966 F.3d at 277-78 (citing *Veney v. Wyche*, 293 F.3d 726, 732 (4th Cir. 2002)).  The factors need only "guide[]" the assessment - courts do not need to analyze them individually at the pleading stage.  *See id.* at 277-79; *Al-Owhali v. Holder*, 687 F.3d 1236, 1240 (10th Cir. 2012).

Although Patuxent has legitimate penological interests in maintaining security and adequate space for new inmates, Mr. Dove plausibly alleges that its actions were not sufficiently "calibrated" to those interests.  *See Fauconier*, 966 F.3d at 278. Mr. Dove alleges that the Native American faith group was strip searched after every religious service and that no other religious group was.  (ECF No. 41, ¶¶ 35-36).  Nothing in the complaint or Defendants' motion suggests the Native American faith group posed

a greater security risk than others who engaged in group services. The sudden and unexplained change in application of the personal property delivery policy to the Native American faith group also "impl[ies] irrationality." *See Fauconier*, 966 F.3d at 279.  By comparison, it is easier to imagine how services might have been delayed by unexpected security needs on any given day.  But the plausibility of that explanation is undercut here by the constancy of the alleged delays and the length of the alleged three-week ban on services.  The plausibility of any administrative explanation for Mr. Dove's transfer is also undercut by the allegation that Native American worshippers were transferred *en masse*.

In any case, Mr. Dove also plausibly alleges that any security or administrative rationales were pretext for improper discriminatory animus.  Mr. Dove alleges that all four Defendants engaged in a deliberate and coordinated campaign to make it difficult or impossible for Native American worshippers to practice their faith because of their race or religion. (*See, e.g.*, ECF No. 41, ¶ 52).  His amended complaint also makes clear that Patuxent would not be unduly burdened or otherwise find it impossible to accommodate the Native American worshippers because it already accommodated all other religious observers.

Mr. Dove's Section 1983 equal protection claim will not be dismissed for failure to state a claim.

**VIII.      Conclusion**

For the foregoing reasons, the motion to dismiss filed by Defendants Laura Armstead and Jason Anderson will be granted in part and denied in part.  A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
